UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

DENISE SHERVINGTON,

                Plaintiff,           09 Civ. 4273

   -against-                    OPINION

VILLAGE OF PIERMONT and JOHN ANGELIS
as Building Inspector of the Village
of Piermont and Individually,

                Defendants.

------------------------------------X

A P P E A R A N C E S:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-16-12

      Attorneys for Plaintiff

      SCHOEPS & SPECHT
      334 S. Middletown Road
      Nanuet, NY  10954
      By:  Michael B. Specht, Esq.

      Attorneys for Defendants

      RUTHERFORD & CHRISTIE, LLP
      369 Lexington Avenue, 8th Floor
      New York, NY  10017
      By:  Lewis R. Silverman, Esq.
          Christopher J. Soverow, Esq.

Sweet, D.J.


The defendants the Village of Piermont ("the Village") and John Angelis ("Angelis" and, with the Village, the "Defendants") have moved pursuant to Fed. R. Civ. P. 56 for summary judgment dismissing the complaint (the "Complaint") of the plaintiff Denise Shervington ("Shervington," or the "Plaintiff").  Plaintiff alleges that she was unlawfully deprived of the use of her finished basement, and the enjoyment thereof, and had to physically dismantle and remove substantial physical improvements from her property located at 664 Route 9W in the Village of Piermont (the "Property").  On the facts and conclusions set forth below, Defendants' motion for summary judgment is granted with respect to the Complaint's federal cause of action, supplemental jurisdiction over the Complaint's state causes of action is declined and the Complaint is dismissed.


**Prior Proceedings**


On March 6, 2009, Plaintiff filed a complaint in the Supreme Court of the State of New York, County of Rockland alleging the following causes of action: (1) intentional

2

infliction of emotional distress; (2) tort per se; (3) fraud; (4) negligence; (5) negligent hiring, training, retention and supervision; (6) equal protection violation via gender and/or race based discrimination; (7) interference with the right to hold and sell property; and (8) procedural and substantive due process clause violations.  On May 1, 2009, Defendants removed the Complaint to federal court, and on June 26, 2009, Defendants moved to dismiss.  Defendants' motion was granted in part and denied in part.  Plaintiff subsequently filed a motion for reconsideration, which was partially granted. Pursuant to the Court's opinion regarding the motion to dismiss dated January 8, 2010 and the Court's opinion regarding the motion for reconsideration dated August 11, 2010, the following claims remain: (1) tort per se (or prima facie tort); (2) fraud; (3) negligence (as against Angelis only); (4) negligent hiring, training, retention and supervision; and (5) substantive due process.

Following discovery, Defendants moved for summary judgment on November 9, 2011.  Pursuant to the schedule agreed to by the parties, the motion was marked fully submitted on March 21, 2012.

**The Facts**

The facts are set forth in Defendants' Local Rule 56.1 Statement and Plaintiff's 56.1 Statement and are not in dispute except as noted below.  The present case centers around the finished basement of a home Plaintiff owned and Defendant Angelis' alleged order to destroy the finished basement, which was not compliant with building codes, when Plaintiff entered into a contract to sell the home to an interested buyer.

The process leading to the construction of the Property began when a building permit was applied for on October 25, 1989.  The builder, Andrew G. Naclerio, applied for the permit on behalf of the owner, Craig Lively, to build a "single family home."  Ownership of the plot changed from Craig Lively to LMH Realty Corp. in November of 1992.  Lucille Hoss, President of LMH Realty Corp., applied for a building permit on November 19, 1992 to build a single family residence on vacant land.  Ms. Hoss proposed to build a two-story frame dwelling.

4

Prior to June 23, 1995, LMH Realty Corp. began negotiations with Michael and Yvadne Bradley for the sale of the plot, and between June 23 and September 19, 1995, the Bradleys closed on the purchase.  The Bradleys applied for a building permit for a new, single family home.  At the time of the Bradleys' application, the plot was described as "land with a[n] unuseable foundation."  A building permit for a single family residence was issued on September 19, 1995.  In October of 1995, the Bradleys applied for a site plan review, and the site plan was approved on October 18, 1995.  As of January 15, 1996, the Bradleys wished to build a three bedroom home.  The only proposed modification pertained to the sanitary system.

By July 28, 1998, the ownership of the subject property changed to Sungold Properties, Inc., and Jaime Dresdner, who was the President of Sungold Properties, Inc., was the owner of the plot.  Mr. Dresdner applied for a building permit on July 28, 1998 to construct a single family dwelling on the vacant lot.  James Tanner was identified as the architect of the proposed building project.  On April 8, 1999, the Deputy Building Inspector, Ronald Olson, noted that there were no zoning violations on the vacant lot.

5

By letter dated September 7, 1999, the Building
Inspector for the Village was informed that the gas burning
fireplaces installed at the Property were code complaint.
There was no mention of the installation of a gas stove in the
basement of September 7, 1999.

Construction plans for the Property were certified
on June 11, 1998.  The certified plans call for an "UNFINISHED
BASEMENT," but Plaintiff notes that the plans do depict a
bathroom in the basement.  The certified plans were revised on
September 13, 1999 so as to include the addition of a deck to
the Property.  Inspections were conducted from January 1998 to
June 1999.  Defendants note that these inspections do not
indicate that construction of a finished basement was in
progress, while Plaintiff states that the inspections are
silent on the issue and do not rule out that construction of a
finished basement was in progress.

On September 23, 1999, $2,700 was placed in escrow
to secure the completion of construction on the site and the
driveway of the single family residence.  Defendants note that
the escrow did not warranty the completion of any construction

6

in the basement.  According to Plaintiff, the escrow agreement
was for the driveway and was silent as to the existence of a
finished basement.  On September 23, 1999, a certificate of
occupancy was issued for the Property, and the permitted use
on the certificate of occupancy was for a single family
residence.

As of November 15, 2000, potential buyers of the
Property, Raymond and Darlene Bruce, were displeased with the
pace of construction.  These potential buyers never indicated
in their complaints any construction matters pertaining to the
basement of the Property.  A listing of the Property dated
December 3, 2004 confirmed that the Property was built in
1999.  The listing also indicated that the Property contained
a "finished basement."  Donna Cox ("Cox"), a real estate agent
who represented Plaintiff, testified that she saw this
listing, inspected the home around this time and observed that
there was a finished basement.  According to Defendants, the
finished basement was constructed sometime between 1999 and
December 3, 2004.  Plaintiff asserts that her construction
manager, Rita Louie ("Louie"), determined that the basement
was constructed at the time that the house was built as the

electrical wiring was date stamped with the year of the
construction of the home.

According to Defendants, the finished basement was
constructed without a building permit.  Plaintiff disputes
this fact, stating that a building permit was issued for the
house, and it is a question of fact as to whether an
additional permit was needed for the basement.  According to
Defendants, the finished basement never received a certificate
of occupancy.  Plaintiff also disputes this fact, stating only
that a certificate of occupancy was issued for the completed
dwelling.

Plaintiff was shown the listing dated December 3,
2004 when she first met with her real estate agent, and
Plaintiff acknowledged that she had seen the listing prior to
making a purchase and that the listing included a disclaimer
that read, "Information deemed reliable but not guaranteed."
Plaintiff testified that her real estate agent requested a
home inspection and reported to her "that there were no
problems."  Plaintiff could not recall whether the inspection
included an interior inspection, but assumed that it had.
Plaintiff hired AmeriSpec Home Inspection Service

("AmeriSpec") to conduct a home inspection of the Property
prior to purchasing it.  Although Plaintiff remembered that
AmeriSpec conducted the inspection, she could not recall
whether she had seen or paid for the report, but assumed that
she had paid for it.  Plaintiff recalled that the report might
have been present at closing, but testified that she did not
read it.

AmeriSpec conducted an inspection of the Property on
June 4, 2005.  Among other things, AmeriSpec noted safety
violations in the basement.  Plaintiff highlights that the
specific safety violations found in the inspection related to
inadequate window access and not to the actual construction.
AmeriSpec advised Plaintiff to "verify that a certificate of
occupancy exists for all finished areas of the lower level."
According to Defendants, Plaintiff personally never requested
or saw a certificate of occupancy at this time.  Plaintiff
states that while she never personally saw the certificate of
occupancy, her title company ordered a violation search on her
behalf and was advised that a certificate of occupancy had
been issued for a single family dwelling.  Defendants
acknowledge that Plaintiff, via her real estate agent, hired
National Granite Title Insurance Agency, Inc. ("National

Granite") to conduct a title search and that National Granite
was asked to obtain the certificate of occupancy and records
of any violations as well as to provide a "street report."
According to Defendants, National Granite was not requested to
conduct an interior inspection.  Plaintiff states that
National Granite did not conduct inspections of the house,
rather it asked the Village of Piermont Building Department if
any violations existed at the premises.  Plaintiff states that
the Village chose not to perform an interior inspection before
responding in the negative.

By letter dated February 17, 2005, Angelis responded
to National Granite's request.  Angelis enclosed a copy of the
Property's certificate of occupancy, stated that there were
"no recorded violations or open building permits" pertaining
to the Property and informed National Granite that "[t]he road
is maintained by the County of Rockland."  Angelis explained
that this letter was issued based on his review of the
Property's building file and did not include or require an
interior inspection under the policies of the Village at that
time.  Plaintiff did not see the February 17, 2005 letter from
Angelis to National Granite prior to her purchase of the
Property.

According to Defendants, Angelis was not requested to perform an interior inspection of the Property in 2005. Plaintiff disputes this contention, stating that National Granite asked the Building Department if any violations existed at the premises. Angelis did not perform an interior inspection and informed National Granite that no recorded violations existed. The response to the violation search did not explain that no interior searches had been performed. The parties agree that Angelis did not conduct an interior inspection of the Property in 2005. Angelis never saw the basement of the Property until Plaintiff was preparing to sell it.

When Plaintiff bought the Property in 2005, the sellers of the Property, Raymond and Darlene Bruce, agreed to refund Plaintiff's down payment should they be unable to convey clean title. The Bruces further promised to discharge any liens or encumbrances on the Property. Defendants believe that the Bruces warrantied that all work performed on the house was done lawfully and pursuant to the proper building permit process, but Plaintiff contends that there is no evidence to support this assertion. The parties do not

dispute that the Bruces warrantied that a certificate of occupancy was obtained as to all work performed on the Property.  Plaintiff agreed to release the Bruces of all obligations, except those meant to survive closing, by accepting the deed at closing.  Plaintiff closed on the purchase of the property on March 11, 2005.  According to Plaintiff, she moved to the Property in March 2005 and an individual by the name of Dr. Richardson began living there in July of 2005.

After August of 2005, in the aftermath of Hurricane Katrina, Plaintiff's children would occasionally spend the weekend at the Property, and her daughter lived there for approximately two to three months following the evacuations. According to Plaintiff, no one ever lived in the basement of the Property.  According to Defendants, Dr. Richardson testified that Plaintiff's son lived in the basement for at least one month.  Plaintiff contends that Plaintiff's son stayed intermittently and that Plaintiff was not aware of the exact dates.  Plaintiff describes her son as an "overnight guest" and disputes Defendants' characterization that he "lived in the basement."

Beginning in October, Plaintiff traveled regularly
to New Orleans to assist in the rebuilding efforts following
Hurricane Katrina, and in the summer of 2007, Plaintiff
decided to leave 664 Route 9W to help full-time with the
recovery efforts.  Plaintiff employed Cox, a real estate
agent, to sell the Property, which first went up for sale in
October 2007.  Although Plaintiff did not know whether an
appraisal of the Property was done, Plaintiff testified that
Cox estimated that the Property would sell for approximately
$860,000, but no higher.  Cox testified that she appraised the
value of the Property at $849,000 based on comparable sale
values, and she memorialized this sales price in the agreement
between her and Plaintiff.

Plaintiff estimated that there were approximately
ten to twelve showings of the Property and that a written
offer of approximately $780,000 was made in November 2007.
Cox testified that Plaintiff countered the $780,000 offer with
$864,000, which was countered with $820,000, which was in turn
countered with $859,000.  The $859,000 counter-demand was
rejected, after which time Plaintiff agreed to $820,000.  The
individuals that made the written offer ended up purchasing
the Property at a final closing value of $820,000 less a

$2,500 refund which was deducted at the closing on January 8, 2008.

Plaintiff claims that she did not notify the Village of the sale of the Property or request an inspection, but believed that the buyers requested an inspection from the Village. Angelis testified that Plaintiff contacted him to request an interior inspection and that he scheduled a time with her for the inspection after receiving a request from a title company as well. Angelis came to the Property on two occasions, both in early December 2007. Plaintiff states that she was not present for the first inspection, but Cox was present. Plaintiff could not recall the specific date of the inspection for which she was present. Plaintiff testified that the Violation Notice of December 10, 2007 reflected the results of the second inspection. Angelis testified that the first walkthrough was with Plaintiff and the second was with Cox. Cox testified that she did not meet with Angelis until after the inspection at the Property where Angelis and Plaintiff were present.

Plaintiff provides a recollection of the inspection for which she was present. Plaintiff could not recall if

14

during the inspection Angelis stated there was a violation
with respect to the smoke detector or carbon monoxide
detector, but testified that he could have noted a problem
with the former.  The inspection concluded in the basement,
where Angelis allegedly told Plaintiff over the course of a
continuous conversation that she "had [an] illegally finished
basement, that he was going to have to order it demolished and
that he had someone who could do it for about $3,000."
Defendants note that Plaintiff could not recall any specific
things Angelis said and could only paraphrase.  Subsequently,
Plaintiff alleged that Angelis had said that he knew either
"someone" or "a friend" who could do the work, but could not
recall which term Angelis used.  Plaintiff testified that
Angelis only suggested a worker once and that she told
Angelis, "I never finished the basement."  According to
Plaintiff, Angelis said the basement, without specifying in
whole or in part, needed to be demolished because it was built
without a permit.  There were no other witnesses to the
conversation.  Plaintiff contends that from the beginning of
the conversation, Angelis was disrespectful, that his attitude
was "rough and dismissive" and that he allegedly "ignored what
[Plaintiff] tried to communicate" about not having done work
on the basement.  Other than Angelis' general demeanor,

Plaintiff did not recall any other acts of disrespect.
Plaintiff testified that she learned from the inspection that
the work needed to be completed by December 28, 2007.  The
inspection of the Property lasted for a total of twenty
minutes.

Angelis has provided his own account of the
inspection at which Plaintiff was present.  According to
Angelis, he began by searching the upper floors and noticed
that smoke detectors were missing in the bedroom areas, then
finished the inspection in the basement.  Angelis concluded
that the Property was in violation based on this inspection.
Angelis observed that there was a finished basement, which he
defined as having finished walls, at a minimum, but
acknowledged that the Village and New York State do not define
the term "finished basement."  During the inspection, Angelis
initially determined that there was a violation based upon
observing the hallway that connected the basement to one
portion of the two-car garage.  According to Angelis, this
hallway was structurally unsound, narrow, poorly lit and was
approximately thirty-five feet in length.  Angelis testified
that the hallway presented a safety risk because, for
instance, fire department personnel could be prevented from

16

existing the building based on not knowing that the hallway
had been installed and that it was shaped in such a way that
one could become disoriented. Angelis noted that the only
egress from the basement were the exit by the kitchen
(accessible by a staircase leading up to the rest of the
house), the garage via the hallway and the windows, which were
small and high on the walls. Angelis concluded, as noted in
the violation, that the basement constituted an illegal
dwelling space because it had a separate means of egress, a
bed and a kitchen. According to Angelis, the basement
extended part-way into the garage, which could no longer fit a
standard size car in that portion of the garage, and the
hallway was also of such poor structural quality that the
walls, which were possibly made of only drywall, would sway
upon the application of minimal force.

Although Angelis could not recall what section of
the code applied, he recalled that there was a section
pertaining to adequate construction and believed that he was
authorized to issue an appearance ticket based on this
violation alone. Additionally, Angelis observed that there
was a queen-sized bed, replete with a headboard and sheets, on
the south wall, which constituted a violation because the

17

basement was not a habitable space.  Leading up to the
bathroom in the basement were three steps that were
constructed of pine and, according to Angelis, appeared
rickety.  These steps also appeared to be improperly spaced
and there was no handrail as required by the building code.
Angelis also noticed a violation pertaining to the kitchen
that was installed against the east wall of the basement and
included cabinets, a sink, a refrigerator and a gas stove.
Angelis observed that the bottom of the cabinets was located
too close to the top of the stove.  At the time of the
inspection, Angelis did not inform Plaintiff of these defects.
Angelis testified that upon returning to his office following
the inspection, he learned that the kitchen was not in the
certified plans.

        According to Angelis' testimony, the violation
pertaining to the cabinets could be fixed by adjusting the
height of the cabinets, but an unapproved or uncertified
kitchen had to be removed and then rebuilt "to a point."
Angelis testified that this "point" was exposing the
"finishes," meaning how the structure was constructed behind
the walls.  Plaintiff states that she, her realtor and her
construction manager each asked Angelis if the violation could

be cured without the need for complete demolition.  According to Defendants, Angelis was never asked to take any action. Plaintiff contends that Angelis was repeatedly asked by Plaintiff and her agents to cure the construction defects without demolition.

Angelis states that he did not give any instructions to Plaintiff regarding the kitchen.  Plaintiff contends that Angelis informed Plaintiff's contractor that everything in the basement had to be removed and issued a Violation Notice to Plaintiff informing her that if she did not demolish the basement, she would be prosecuted in court.  Angelis testified that he did discuss how to clear the violations in the basement when Plaintiff came to his office less than a week after the inspection.

The actual notice, which is dated December 10, 2007, states that "it has been determined that the basement and garage portions of the dwelling have been illegally converted from an unfinished space to a dwelling unit."  The violation warned that "this illegal conversion is considered an imminent threat to life, safety and real property and use is ordered to cease and desist immediately."  The violation further ordered

19

that the illegal conversion be restored to its original state by December 28, 2007. The violation warned that "[f]ailure to comply will result in a summons/appearance ticket being issued and answerable in the Village of Piermont Justice Court."

Shortly after the inspection, Plaintiff called the title company to have "a copy of the certificate of occupancy" faxed to her. The same day that she received the report, Plaintiff, accompanied by Dr. Richardson, went to the Village offices to confront Angelis because she "thought [she] could show him that [she] hadn't done anything." Plaintiff could not recall the exact sequence or wording of the conversation but testified that she asked him to "release [her] from whatever he was demanding" because the document showed that there were no violations. Plaintiff testified that Angelis' "attitude was that [the document] didn't prove anything and that . . . nothing would change" and that Angelis stated that Plaintiff would need to abide by his instructions or legal action, in the form of issuing a violation and potentially having to go before a judge, could result. Plaintiff acknowledged in her deposition that the document she brought to her confrontation with Angelis did not state that an interior inspection was conducted. Plaintiff pointed out that

20

Angelis signed the document, and Angelis replied that, at that
time, an interior inspection was not required but that the
Village's policy had changed.  Plaintiff allegedly demanded to
see where the policy was recorded, and Angelis, according to
Plaintiff, stated that he was not required to show Plaintiff.

During the confrontation, according to Plaintiff,
she began to cry.  Plaintiff claimed that, at some point,
Angelis' assistant entered the room and suggested that the
office just issue the certificate of occupancy.  In response,
Angelis allegedly ordered the assistant to go back to her
office.  Plaintiff claimed that Angelis then referred to
Plaintiff as "lady," to which Plaintiff took offense and
replied, "I'm a doctor to you."  In her deposition testimony,
Plaintiff claimed that Angelis was always hostile in her
interactions with her, but that he became visibly angry when
he called her "lady."  Plaintiff admitted that this was only
her second interaction with Angelis and that she had no
knowledge as to how his demeanor changes depending on if he is
angry or embarrassed.  In total, the confrontation in the
office lasted approximately thirty minutes.

In his deposition testimony, Angelis did recall that he told Plaintiff that she had to remove the violation, but did not tell her that she had to demolish anything. Plaintiff did not ask what "remove the violation" means or how to achieve it. Angelis denies having, either of his own initiative or in response to a request by Plaintiff, discussed or recommended a potential contractor or how much it would cost to remedy the violation. Angelis testified that he did not have any further contact with Plaintiff following the confrontation in his office.

Angelis testified that he spoke with Plaintiff's agents at various points after the incident in his office. He remembered speaking to Cox on one occasion when she came to his office to discuss her recollection of the Property having a finished basement prior to Plaintiff's purchase of it, but he did not recall any discussion of how to proceed with removal of the violation. Angelis recalled speaking with Plaintiff's counsel regarding delays and failed inspections, but not about how to remedy the violation. Angelis testified that he spoke with Plaintiff's counsel about the project being delayed due to efforts made by Louie, Plaintiff's construction manager, to circumvent the scope of the permit. Angelis

recalled having multiple conversations with Louie, the first
of which occurred when Louie filed a demolition permit to
remove the "finishes," which Angelis testified consisted of
the walls, the bathroom, the kitchen, the hallway and the
garage.  Angelis acknowledged that he raised his voice at one
point during his meeting with Plaintiff and that he used the
phrase "ladies, ladies please" when both Plaintiff and Dr.
Richardson spoke to him simultaneously.  According to Angelis,
Plaintiff responded by saying "how dare you, I'm Dr.
Shervington."  Dr. Richardson testified that Angelis actually
said "girls, girls, calm down, calm down."

Following the confrontation, Plaintiff called her
attorney and Cox.  After agreeing with each other that there
was no other alternative, Cox reportedly suggested to
Plaintiff that they look for a contractor to do the work.
Plaintiff had no involvement with searching for a contractor
and, after Cox searched for approximately two or three days,
she accepted Cox' suggestion for someone that was available
for immediate work.  Plaintiff spoke with the contractor,
Louie, who estimated the cost of construction to be $10,000.
After providing the estimate, Louie met with Angelis to
discuss what work needed to be done.

According to her deposition testimony, Louie understood the scope of the project to involve a basement renovation involving bringing a finished basement "up to code" because Plaintiff intended to sell the Property.  During the initial discussions, Plaintiff did not inform Louie that a violation had been issued.  Based on conversations with Plaintiff and Cox, Louie was under the impression that the kitchenette and hallway in the basement were holding up the sale of the home.  As a result of these discussions as well as speaking with Angelis, Louie believed that the kitchenette and the hallway in the basement needed to be removed in order for the space to be brought up to code.  Louie testified that she and Plaintiff did not negotiate over the price or get estimates from other contractors.

On December 12, 2007, Cox wrote to Plaintiff's counsel with five proposed solutions to remedy the violation. Cox noted that Plaintiff was "willing to discuss adjusting the sales price of the property to compensate the buyers for having to do additional work in the basement to remedy the existing violations and/or to re-sheetrock the basement."  The letter indicates that Plaintiff's counsel was to discuss these

24

proposed solutions with Angelis.  Besides going to Angelis'
office, Plaintiff did not initiate any proceedings or
otherwise challenge the violation notice.

On or about December 17, 2007, Plaintiff entered
into a contract with Louie's construction firm, RJL
Development, Inc. ("RJL").  According to Louie, under the
agreement, the work only entailed the demolition of the
kitchenette and hallway.  RJL agreed to "commence demolition
portion responsibilities on [December 18, 2007]."  The scope
of the project was "the demolition work required to restore
the premises to the condition specified by the building
inspector.[sic] only."  On December 24, 2007, Louie applied
for a demolition permit, and the application was approved the
same day.

Louie testified that the basement as it existed
prior to demolition was constructed in 1997, which she knew
because the electrical fixtures and wiring in the basement was
time stamped.  Louie believed that the house was built in 1997
and "can only assume" that the basement was constructed at the
same time because the wiring bore the 1997 stamp.  Louie later
testified that she did not know for certain when the house was

built, but was basing her opinion of what she was told by
"maybe a realtor."  "Very early" in the demolition process,
Louie brought portions of the wire and showed them to Angelis.
According to Louie, Angelis became "very angry" and, in her
opinion at that time, Louie believed he was angry because she
was challenging his authority.  At this meeting, Angelis
allegedly stated, for the first time, that the whole basement
needed to be demolished.  Prior to the conversation, Louie
alleged that Angelis' instructions were to remove the kitchen
and the wall separating the garage in order to make the
basement code complaint.  Angelis denied ever indicating that
some portions of the basement could remain while others needed
to be removed, and Angelis denied ever becoming angry with
Louie.  Angelis also denied ever been shown the time-stamped
wire.

Angelis recalled that Louie, during an inspection,
requested that the majority of the basement, namely the walls,
bathroom, plumbing and electrical system, be permitted to
remain.  According to Defendants, Angelis responded that she
had to remove everything because she filed a demolition
permit.  Plaintiff notes that Angelis admitted that it would
have been possible to allow the construction to remain subject

to inspection but did not inform Louie of that possibility.
Angelis testified that had Louie not filed the demolition
permit, Louie could have kept "as much as he could see," which
would have included the framing but not the electrical, which
needs to be certified by a third-party inspector upon a
request by the original installer.  According to Plaintiff,
there is no requirement that only the original installer can
request an electrical inspection.

Angelis recalled discussing the wiring with the
electrician retained by Plaintiff or her agents.  The
electrician told Angelis that "the wires were fine" and asked
permission to leave the wires in place.  Defendants contend
that in response, Angelis asked the electrician if he was
aware that only the original installer could inspect the
wiring, to which the electrician replied in the affirmative.
Defendants contend that Angelis did not permit the inspection
of the wiring because it was illegal to have anyone other than
the original installer request the inspection.  Plaintiff
disputes both of these contentions.  Angelis testified that he
ordered the demolition of a basement or other structures in
nearly identical circumstances on several occasions.

27

According to Defendants, the bathroom and ceiling, which contained wiring to support the lighting system, had to be removed because it was constructed without approval and was not inspected while being constructed.  Plaintiff disputes this allegation.  Angelis acknowledged that removing a portion of the sheetrock was a potential solution, but, according to Defendants, Angelis did not offer it as a solution because he was not asked.  Plaintiff disputes that Angelis was not asked. Angelis did not inform Plaintiff that she could appeal his decision to the Village's Zoning Board of Appeals or the New York State Codes Department, but he did advise Louie that she could appeal to the New York State Codes Department.

Ultimately, there were two phases of work done in the Property's basement – demolition and construction. According to the invoice from RJL, demolition occurred between December 19, 2007 through December 28, 2007 at a cost of $3,677.88.  At no point during the demolition process was Angelis informed that Plaintiff or her agents intended to apply for a building permit.

Louie testified that on December 27, 2007, after she was initially refused access to the building file, she filed a

FOIL request.  After the request had been received, Louie was informed that she could look at the plans at the office of the Building Inspector.  When Louie arrived, Angelis informed her that the plans were not there and instructed her to come back the next day.  Although the parties dispute whether Angelis promptly responded to the FOIL request, Louie was ultimately able to review the plans.  Louie testified that only the "finishes" were inconsistent with the original plan and that there was no need to demolish the basement.

On January 8, 2008, Plaintiff and RJL entered into another contract.  According to Plaintiff, the buyers of the Property insisted that the basement be finished, as contracted.  RJL agreed to commence "Phase 2" of the project, which consisted of renovating the basement of the Property, as of the date of the contract in consideration for "a total amount not to exceed $14,000.00."  Plaintiff reached out to the Mayor and Village Board via letter dated January 8, 2008 and that she "said something" at a public meeting about how she wanted a response to her letter.

On January 25, 2008, Plaintiff or her agents applied for and were granted a building permit.  The permit noted the

cost of construction as $12,000.  The building permit allowed
the holder to "finish basement" and "add full bath and sink."
On January 28, 2008, Angelis approved the demolition of the
basement, cleared the violation and gave notice that there
were no recorded violations on the Property.  After an issue
involving insulation was resolved, the construction was
inspected and approved.  On February 5, 2008, RJL issued an
invoice to Plaintiff for $15,858.40, which was reduced to
$9,980.13 in recognition of Plaintiff's $5,000 deposit and an
$878.27 deduction in recognition of the excess over $14,000.
On February 28, 2008, a final inspection of the construction
was conducted, and the final inspection was passed.  An
invoice following completion of both the demolition and
construction projects indicates the total cost to be
$30,506.61.

        While construction was underway, Plaintiff claimed
that she, Cox and Louie were in regular contact.  Plaintiff
recalled that Cox relayed communications between herself and
the buyers, who had entered into the contract of sale in
November, wanted to move into the house in December and were
now trying to negotiate a "better deal" due to having to wait
to move into the Property.  On February 27, 2008, Plaintiff's

counsel notified the attorney for the buyers that Plaintiff
had completed all the repairs requested by the buyers.  On
February 29, 2008, the attorney for the buyers responded to
Plaintiff's counsel's letter and stated that his clients were
disappointed with Plaintiff's failure to address their
concerns properly.  The buyers' attorney further stated "[i]t
is unfortunate that [Plaintiff] may have purchased the house
with the illegal installations or installed them herself, but
this is [Plaintiff's] issue.  The purchaser did not bargain
for that and had no interest in purchasing any illegal
condition."  The buyers' attorney also advised that his
clients "would be willing to accept the house without a
finished basement and kitchen therein if the items previously
listed and sent to you are addressed."

Plans for the basement were revised and submitted a
total of four times.  Each plan was revised due to
deficiencies identified by Angelis that were required to be
addressed before the issuance of a determination that the
space is code complaint.  The final plan was submitted on
March 4, 2008, and Angelis issued a certificate of occupancy
on March 13, 2008.  Plaintiff closed on the sale of the
Property the same day that the certificate of occupancy was

31

issued.  The closing included a $2,500 credit to the buyers
due to the delays in closing.

## The Applicable Standard

Summary judgment should be rendered if the
pleadings, the discovery and disclosure materials on file, and
any affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a
matter of law.  Fed. R. Civ. P. 56(c).  The courts do not try
issues of fact on a motion for summary judgment, but, rather,
determine "whether the evidence presents a sufficient
disagreement to require submission to a jury or whether it is
so one-sided that one party must prevail as a matter of law."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106
S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"The party seeking summary judgment bears the burden
of establishing that no genuine issue of material fact exists
and that the undisputed facts establish [its] right to
judgment as a matter of law."  Rodriguez v. City of N.Y., 72
F.3d 1051, 1060-61 (2d Cir. 1995).  Summary judgment is
appropriate where the moving party has shown that "little or

no evidence may be found in support of the nonmoving party's
case.  When no rational jury could find in favor of the
nonmoving party because the evidence to support its case is so
slight, there is no genuine issue of material fact and a grant
of summary judgment is proper." Gallo v. Prudential
Residential Servs., L.P., 22 F.3d 1219, 1223-24 (2d Cir. 1994)
(citations omitted).  In considering a summary judgment
motion, the Court must "view the evidence in the light most
favorable to the non-moving party and draw all reasonable
inference in its favor, and may grant summary judgment only
when no reasonable trier of fact could find in favor of the
nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir.
1995) (internal citations and quotation marks omitted); see
also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475
U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
However, "[t]he non-moving party may not rely on mere
conclusory allegations nor speculation, but instead must offer
some hard evidence showing that its version of the events is
not wholly fanciful." D'Amico v. City of N.Y., 132 F.3d 145,
149 (2d Cir. 1998).

     When deciding a motion for summary judgment, a court
must remain mindful of the fact that summary judgment is "an

extreme remedy, cutting off the rights of the non-moving party to present a case to the jury." H & M Hennes & Mauritz LP v. Skanska USA Bldg., Inc., 617 F. Supp. 2d 152, 155 (E.D.N.Y. 2008).

**Defendants' Motion For Summary Judgment Is Granted With Respect To Plaintiff's Substantive Due Process Claim**

Plaintiff's federal claim will be addressed first as it informs the issue of supplemental jurisdiction. Plaintiff claims that Defendants' actions denied her substantive due process. "Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill advised." Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir. 1995) (internal quotation marks omitted). Viewing the facts in the light most favorable to Plaintiff, as is required when evaluating Defendants' motion for summary judgment, Plaintiff has presented evidence establishing Angelis to have acted in a manner that is arbitrary, vindictive and potentially corrupt. However, both because Plaintiff's federal claim is not ripe and because Plaintiff has failed to establish her property interest in the finished basement, Defendants' motion for summary judgment

34

must be granted with respect to Plaintiff's substantive due
process claim.

## A. Plaintiff's Federal Claim Fails Because It Is Not Ripe

Although Plaintiff's Complaint alleges a substantive
due process claim, there is some dispute between the parties
concerning whether Plaintiff's cause of action is properly
styled as a substantive due process claim or a Takings Clause
claim.  According to Defendants, Plaintiff's claim blurs the
line between the Takings Clause of the Fifth Amendment, made
applicable against the states by the Fourteenth Amendment, and
the substantive due process clause.  Irrespective of whether
the cause of action is a substantive due process claim or a
Takings Clause claim, the claim must be ripe before a federal
court can address its merits.  The Supreme Court of the United
States in Williamson County Regional Planning Comm'n v.
Hamilton Bank, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126
(1985), sets forth the applicable standard for ripeness,
providing a two-pronged ripeness test.  The first prong of the
Williamson County ripeness standard requires the government
entity charged with enforcing the land use regulations to have
rendered a "final decision."  Id. at 186.  The second prong

35

requires the plaintiff to have sought compensation if the state provides a "reasonable, certain and adequate provision for obtaining compensation."  Id. at 194.

    This ripeness test is applied differently depending on whether Plaintiff's claim is considered a Takings Clause claim or a substantive due process claim.  For Takings Clause claims, both prongs of the Williamson County ripeness test are fully applicable.  See Southview Assocs., Ltd. v. Bongartz, 980 F.2d 84, 96 (2d Cir. 1992).  With respect to a substantive due process claim predicated on arbitrary and capricious government conduct, only the final decision prong of the Williamson County ripeness test is applied.  See id. at 96-97. The Second Circuit has articulated the rationale for requiring a final decision, noting that "[u]nless a court has a final decision before it, it cannot determine whether a claimant was deprived of property and whether the government conduct was arbitrary or capricious."  Id. at 97.  The second Williamson County requirement, that the plaintiff seek an available state remedy, is not applicable to a substantive due process claim. Id.

Whether Plaintiff's federal claim is styled as a
Takings Clause claim or a substantive due process claim, it
fails because the claim is not ripe for review.  As noted
above, the final decision prong of the Williamson County
ripeness test applies to both Takings Clause claims and
substantive due process claims.  The Second Circuit has helped
define the contours of the "final decision" prong of the
Williamson County test:

> In Williamson, a developer claimed that the county zoning
> commission's denial of approval of his plans for a
> residential subdivision constituted a regulatory taking.
> The developer could have sought "variances that would
> have allowed it to develop the property according to its
> proposed plat."  Based largely on the developer's failure
> to pursue such variances, the Court found that the
> developer had not yet obtained a final, reviewable
> decision-the type of decision that would "conclusively
> determine whether [the developer] will be denied all
> reasonable beneficial use of its property." . . . In
> addition to Williamson, several other Supreme Court
> decisions help define the contours of a "final decision."
> As the Williamson Court explained, in Penn Central
> Transp. Co. v. New York City, the plaintiff's taking
> claim was unripe because, although the city commission
> had rejected one development plan, "the property owners
> had not sought approval for any other plan, and it
> therefore was not clear whether the Commission would deny
> approval for all uses that would enable the plaintiffs to
> derive economic benefit from the property."  And in
> MacDonald Sommer & Frates v. County of Yolo, the county
> Board of Supervisors affirmed the county Planning
> Commission's rejection of a landowner's subdivision plan.
> The Court held that, based on the pleadings which
> revealed that only one subdivision proposal had been
> submitted and only one had been denied approval, the
> landowner had failed to satisfy the final decision

requirement because the possibility existed that "some
development will be permitted."

Southview Assocs., 980 F.2d at 97-98 (citations omitted).


        Applying the Second Circuit's standard to this case
reveals that there has been no final determination concerning
Plaintiff's finished basement.  Plaintiff did not appeal
Angelis' determination that demolition was necessary, only
submitting her letter to the Mayor and Village Board after the
basement had been demolished.  As noted in the Court's January
8, 2010 opinion regarding Defendants' motion to dismiss,
Plaintiff did not file an Article 78 proceeding or appeal
Angelis' decision to the local board of appeals as per New
York Village Law § 7-712(b)(1).  Pursuant to 19 N.Y.C.R.R. §§
1205.2-1205.5, Plaintiff could have appealed or requested a
variance from the regional board of review.  However, because
Plaintiff did not pursue these options, a final decision has
not been reached under the Second Circuit's standard derived
from Williamson County, Penn Central and MacDonald, and
Plaintiff's claim is not ripe for review.


        It must be noted that the Second Circuit has also
ruled that "the finality requirement is not mechanically

applied." Murphy v. New Milford Zoning Comm'n, 402 F.3d 342, 349 (2d Cir. 2005). "A property owner, for example, will be excused from obtaining a final decision if pursuing an appeal to a zoning board or appeals or seeking a variance would be futile." Id. (citations omitted). In arguing futility, Plaintiff contends that she could not have applied for a building permit for the existing basement work because Angelis' own actions and statements made it evident that such an application would be futile. Plaintiff also notes that she was under contract to sell the house, and any delays would have resulted in her either being in breach of contract or losing the benefit of the sale. However, neither of these arguments addresses why requesting relief from agencies outside of Angelis' control, such as the local board of appeals or regional board of review, would have been futile.

Plaintiff cites the case of Patsy v. Board of Regents of the State of Florida, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) for the proposition that a plaintiff is not required to exhaust her administrative remedies as a prerequisite for bringing a constitutional claim. However, Plaintiff's reliance on Patsy is misplaced, as Patsy involved a 42 U.S.C. § 1983 employment discrimination claim in which

the plaintiffs sought to recover for alleged violations of the
Equal Protection Clause.  The Supreme Court in Williamson
County analyzed Patsy and noted that "[t]he question whether
administrative remedies must be exhausted is conceptually
distinct, however, from the question whether an administrative
action must be final before it is judicially reviewable."
Williamson County, 473 U.S. at 192 (citation omitted).  Thus,
the Williamson County Court distinguished procedures allowing
an individual to seek a variance from an initial decision
maker's determination versus an appeal that is purely remedial
in nature.  Plaintiff's citation to Town of Orangetown v.
Magee, 88 N.Y.2d 41, 643 N.Y.S.2d 21, 665 N.E.2d 1061 (1996)
is also unavailing, as the New York Court of Appeals in that
case affirmed that, although a plaintiff need not fulfill
prong-two of the Williamson County ripeness test in a
substantive due process claim (what the Court of Appeals
describes as "the requirement that administrative remedies
must be exhausted"), a plaintiff is still required to
demonstrate finality.  See Magee, 88 N.Y.2d at 51.

        Because Plaintiff cannot establish finality, as
required under the first prong of the test promulgated in
Williamson County, Plaintiff's claim - be it a Takings Clause

claim or a substantive due process claim - is not ripe, and
Defendants' motion for summary judgment is granted with
respect to Plaintiff's federal cause of action.

### B. Plaintiff's Federal Cause Of Action Fails Because Plaintiff Cannot Establish A Property Interest In The Finished Basement

In addition to the ripeness issue, Plaintiff's
substantive due process claim fails because Plaintiff cannot
establish a constitutionally protected property interest in
the finished basement.  In order to demonstrate a substantive
due process claim in a land use case, it is well-settled that
a party must first establish that it had a constitutionally
protected property interest, and then establish that the
deprivation of that interest was without due process of law.
See Zahra v. Town of Southold, 48 F.3d 674, 679-80 (2d Cir.
1995); Southview Assocs., 980 F.2d at 101; RRI Realty Corp. v.
Incorporated Village of Southampton, 870 F.2d 911, 917 (2d
Cir. 1989); Yale Auto Parts, Inc. v. Johnson, 758 F.2d 54, 60
(2d Cir. 1985).  The question of whether the plaintiff has a
property interest is a matter of law for the court.  RRI
Realty Corp., 870 F.2d at 918.  "To have a property interest
entitled to Fourteenth Amendment procedural protection, a

person clearly must have more than an abstract need or desire

for it.  He must have more than a unilateral expectation of

it.  He must, instead, have a legitimate claim of entitlement

to it." R-Goshen LLC v. Village of Goshen, 289 F. Supp. 2d

441, 450 (S.D.N.Y. 2003) (citing Bd. of Regents v. Roth, 408

U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).


          The evidence presented in this action establishes

that the Property's basement was not covered by a certificate

of occupancy.  Although Plaintiff disputes in her Local Rule

56.1 Statement Defendants' contention that the basement never

received a certificate of occupancy, Plaintiff merely states

"a certificate of occupancy was issued for the completed

dwelling."  See Pl.'s L.R. 56.1 Statement ¶ 45.  The certified

plans for the Property note: "UNFINISHED BASEMENT," and the

certificate of occupancy for the Property, dated September 23,

1999, notes that the "new home situated on the above mentioned

premises conforms substantially to the approved plans[.]"

Plaintiff does not dispute that Plaintiff's construction

manager, Louie, acknowledged that the certified plans called

for an unfinished basement and did not include a kitchenette.

See Pl.'s L.R. 56.1 Statement ¶ 217.  The closest Plaintiff

comes to establishing the basement to be covered by a valid

certificate of occupancy is to cite Louie's testimony that some of the wiring used in the basement bore a date stamp from 1997 and that from this stamp Louie assumed the basement to be constructed in 1997, the year Louie believed the house to have been built. See id. ¶¶ 219, 220. However, Louie acknowledged that she did not know for certain when the house was constructed. See id. ¶ 221. Furthermore, Plaintiff does not dispute the interpretation of Plaintiff's construction manager, who testified that the "finishes" in the basement, such as the kitchenette, were inconsistent with the "original plan" and the building code. See id. ¶ 271. Aside from Louie's speculation concerning the wiring, see McPherson v. N.Y. City Dep't of Educ., 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("speculation alone is insufficient to defeat a motion for summary judgment"), there is no evidence in the record establishing the existence of the basement's finishes at the time the September 1999 certificate of occupancy was issued.

It is well-settled that property interests are defined by state law. See R.R. Village Assoc. v. Denver Sewer Corp., 826 F.2d 1197, 1201-02 (2d Cir. 1987). The Rules and Regulations of the State of New York prohibit occupation of any space that was not built pursuant to the building permit,

43

inspection and certificate of occupancy process.  See 19

N.Y.C.R.R. § 1202.3.  There can be no claim of a property

interest where the right to occupy is proscribed by New York

State law, thereby rendering the substantive due process

clause inapplicable.  See Bd. of Regents, 408 U.S. at 577 ("To

have a property interest in a benefit, a person clearly must

have more than an abstract need or desire for it.  He must

have more than a unilateral expectation of it.  He must,

instead, have a legitimate claim of entitlement to it."); see

also Cunney v. Bd. of Trs., 675 F. Supp. 2d 394, 402 (S.D.N.Y.

2009) (rejecting a substantive due process claim based on an

inspector's denial of a certificate of occupancy because

plaintiff had never established a legitimate claim to occupy

the property and, therefore, the defendant could not be held

liable for violating a constitutional right that never

vested), rev'd on other grounds, 660 F.3d 612, 626 (holding

that the village zoning law was unconstitutionally vague and

vacating the district court's summary judgment decision on

plaintiff's substantive due process claim).


        Plaintiff contends that the wrongdoing in this case

was Defendants' insistence upon the demolition of the basement

to the exclusion of all other remedies, such as the issuance

of an "as-built" permit.  Notwithstanding Plaintiff's
contentions, the main element in determining the existence of
a property interest is the extent to which the deciding
authority may exercise discretion in reaching its decision,
rather than on a party's estimate of the likelihood of a
certain decision.  If the deciding authority has discretion to
grant or deny a permit or application and has not yet acted,
the applicant has no vested property right to issuance of the
permit or a favorable decision on the application.  Crowley v.
Courville, 76 F.3d 47, 52 (2d Cir. 1996) (no protected
property interest in variance where zoning regulations granted
zoning board with discretionary approval powers); Gagliardi v.
Village of Pawling, 18 F.3d 188, 192 (2d Cir. 1994)
(landowners had no property interest in enforcement of zoning
laws for adjacent property since municipal officials had broad
discretion in determining whether to grant or deny building
permit, site plan and variances); RRI Realty Corp., 870 F.2d
at 918-19 (no property interest existed in building permit
since town officials had wide discretion to either grant or
deny the permit).  The parties agree that, as the Village's
Building Inspector, Angelis was authorized to issue violations
and appearance tickets for non-compliance with a section of
the State or Village's law or building code.  Furthermore, the

45

parties agree that Angelis was the only employee of and the head of the Village's Building Department, and that Angelis reported directly to the Village Board and did not have any other supervisors.  As such, the evidence presented establishes that Angelis had the discretion to issue the as-built permit or suggest an option other than demolition of the basement, but he was not required to do so.  Under the applicable case law, Plaintiff cannot establish that she had a property interest based on Angelis' refusal to provide her with an alternative remedy to cure the Property's building code violation.

In her opposition, Plaintiff raises two arguments, stating first that it is erroneous to conflate the requirement to comply with the regulatory building permit laws with Plaintiff's right to own property, and second that safety is the underlying rationale for the building codes and that whether the basement was safe or not does not affect Plaintiff's property rights in the premises.  In support of her first argument, Plaintiff poses the hypothetical question of whether a vehicle owner's failure to register his car forfeits whatever ownership rights the person has in the vehicle.  In support of her second contention, Plaintiff cites

the case of Heidorf v. Town of Northumberland, 985 F. Supp.
250 (N.D.N.Y. 1997) for the proposition that the mere fact
that building is unsafe does not cause a plaintiff to forgo
her property interest in the building.

However, as noted above, Plaintiff's first argument
is without merit, as property interests are defined by state
law, the applicable New York State statutes mandate that an
illegal conversion (or any space without a certificate of
occupancy) cannot be occupied or used and applicable case law
establishes that there can be no claim of a property interest
where there is no right to occupy the premises.  Plaintiff's
reliance on Heidorf is misplaced, as the Heidorf court
dismissed the plaintiff's substantive due process claim
because it was, in actuality, a Fourth Amendment seizure
claim.  See Heidorf, 985 F. Supp. at 257 ("[T]he crux of
plaintiff's substantive [due process] claim is in fact derived
from an explicit textual source: the Fourth Amendment. . . .
Because this claim is grounded in an explicit textual source,
[plaintiff's] substantive due process claim must be
dismissed.").

47

Because Plaintiff cannot establish that she had a "property interest," her substantive due process claim fails as a matter of law. See Zahra, 48 F.3d at 680 ("To state a substantive due process claim, a party must first establish that he had a valid 'property interest' in a benefit that was entitled to constitutional protection at the time he was deprived of that benefit.").[1] Accordingly, Defendants' motion for summary judgment is granted with respect to Plaintiff's substantive due process claim.

**Pendent Jurisdiction Over Plaintiff's State Law Claims Is Declined**

---

[1]   As noted above, the parties' summary judgment briefing also raised the issue of whether Plaintiff raised a viable claim under the Takings Clause. In addition to failing to fulfill the requirements of prong-one of the Williamson County ripeness test, any Takings Clause claim asserted by Plaintiff would also fail under prong-two of the Williamson County test. The Williamson County second prong "stems from the Fifth Amendment's provision that only takings without 'just compensation' infringe on that Amendment." Suitum v. Tahoe Regional Planning Agency, 520 U.S. 725, 734, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997). As such, under prong-two, a property owner must seek compensation for an alleged taking before proceeding to federal court. See Williamson County, 473 U.S. at 194-95. No evidence has been presented that Shervington sought compensation in any form other than the present action.

Having dismissed the federal claims in this case,
the Court declines to exercise supplemental jurisdiction over
Plaintiff's remaining state-law claims.  See 28 U.S.C. §
1367(c)(3).  The Second Circuit has instructed that "in the
usual case in which all federal-law claims are eliminated
before trial, the balance of factors to be considered under
the pendent jurisdiction doctrine – judicial economy,
convenience, fairness, and comity – will point toward
declining to exercise jurisdiction over the remaining state-
law claims."  Valencia ex rel. Franco v. Lee, 316 F.3d 299,
305 (2d Cir. 2003) (quoting Carnegie-Mellon Univ. v. Cohill,
484 U.S. 343, 350 n.7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988));
see also Vincent v. Money Store, No. 03 Civ. 2876, 2011 WL
4501325, at *5 (S.D.N.Y. Sept. 29, 2011).  This case presents
no basis for deviating from the balance articulated by the
Second Circuit and dismissal of the remaining state law claims
without prejudice is warranted.[2]

**Conclusion**

---

[2]    Although Defendants, in their summary judgment briefing,
claim that there is no municipal liability, and that the
doctrines of absolute and qualified immunity apply, the Court
need not reach these defenses as the Complaint is dismissed on
alternative grounds.

Based on the facts and conclusions set forth above, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's substantive due process claim, declines to exercise supplemental jurisdiction over Plaintiff's state law claims, and dismisses the Complaint in its entirety, with prejudice as to the substantive due process claim and without prejudice as to all other claims.

It is so ordered.

New York, NY
May / 4, 2012

_____
ROBERT W. SWEET
U.S.D.J.